STERN (UNITED STATES v.). See Case No. 16,389.

---

## Case No. 13,378.

### STERN v. WISCONSIN CENT. R. CO. et al.

[11 Chi. Leg. News, 384; 8 Reporter, 488; [1] 27 Pittsb. Leg. J. 40.]

Circuit Court, E. D. Wisconsin. April, 1879.

RAILROAD COMPANY—MORTGAGE—FORECLOSURE BY BONDHOLDER.

A mortgage of a railroad was given to secure the holders of bonds. Default having been made in payment of the interest, a bill was filed by the trustees of the mortgage, asking that they be put into possession. A funding system was adopted by which payment of interest on the bonds was postponed, and the money used in completing the road. The proceeds of sale of certain lands were also used in construction of the road, to which the trustees, under the mortgage, assented. On a bill filed by a bondholder who had not assented to the funding arrangement, *held*, that although there had been a diversion of the funds of the road, yet there having been no demand by the bondholders upon the trustees to foreclose and sell, the plaintiff, as one of the bondholders, could not by original bill proceed and ask for a foreclosure and sale; he should ask to be made a party, for the protection of his interest, to the litigation already pending in court.

[This was a bill in equity by Theodore Stern against the Wisconsin Central Railroad Company and others. Heard on motion for decree of foreclosure.]

Mr. Mariner, for plaintiff.

Mr. Finch, Jr., for defendants.

---

[1] [8 Reporter, 488, contains only a partial report.]

DRUMMOND, Circuit Judge. This is a bill filed by the owner of bonds secured by a mortgage, given to trustees by the railroad company. By various acts of the legislature of this state, certain companies were authorized to construct a railroad from Menasha, by way of Stevens' Point, to Lake Superior, and from Stevens' Point south to Portage City. The companies became consolidated into what is known as the Wisconsin Central Railroad Company. After this consolidation a mortgage was made on the whole railroad to secure certain bonds which were issued, and upon which money was raised, and the road partially constructed. The interest was paid on the bonds for a few years, but default having been made in the payment of interest, a bill was filed in this court by the trustees of the mortgage, in December, 1875, asking that the property should be put in their possession. There was a subsequent mortgage made in conformity with the authority contained in the original mortgage for further assurance. A supplemental bill was then filed, stating various facts which it is important that we should consider. With the funds obtained on the bonds issued under the original mortgage the company was unable to finish the road, and a funding system was proposed, by which the payment of certain interest coupons was to be postponed for a series of years, and some advances were to be made by the bondholders for the completion of the road. Under this funding arrangement a large number of bondholders surrendered their coupons, and made advances of money with which the road was finally finished throughout its entire length from Portage City and Menasha via Stevens' Point to Lake Superior. The supplemental bill stated that it was of the greatest importance that the road should be completed, because congress had made grants of lands which could only be available on condition that the road was finished within a certain time, and because the proceeds of the land constituted one of the principal funds relied on for its construction. These facts were the main inducement which caused a majority of the bondholders to make the advances mentioned, and the trustees to acquiesce, they believing it to be for the best interests of all the bondholders. But some of the bondholders did not accede to this proposition, and took no part in the funding arrangement. It appears that in consequence of the want of funds, the proceeds of the sale of certain lands that had been made by the company were used in the construction and completion of the road. By the terms of the mortgage this could only be done with the consent of the trustees, as the title of the railroad property, including the lands, was vested in them. They assented, as they say in their supplemental bill, to this appropriation of the money arising from the sale of lands because they thought it for the best interests of all concerned. It appears by the pleadings in this case that the company had become insolvent, and even with the assistance obtained from the proceeds of the sale of lands, it was unable to meet the interest on its bonds, to which purpose in a certain contingency these proceeds were to be appropriated. For the advances made by the bondholders in the manner stated, under the funding arrangement, additional bonds were issued, and one of the questions in the case grows out of this fact, which, however, may be settled when the court shall consider the manner in which the distribution shall be made of any fund which there may be in court arising from the sale of the property, or from the income of the road. The plaintiff in the bill now before the court, which was filed on the ——day of ——, 1878, and who is a bondholder who did not become a party to the funding scheme, complains that the trustees had violated their trust, and asks that the property be sold, under a decree of foreclosure. This, it will be observed, is an independent bill, distinct from the original and supplemental bills filed by the trustees, both of which simply ask for a strict foreclosure, and the possession of the property, and not for its sale. The gravamen of this bill is, that as by the mortgage executed by the company it was provided that the funds arising from the sale of any lands granted to it should be used in a particular way, and as the trustees have diverted those funds from the use authorized by the mortgage, they should not be permitted to remain as trustees of the interest of all the bondholders, and to control the litigation.

In considering the question now before the court we have to treat this allegation as true, and must consequently concede that this was an unauthorized diversion by the trustees of the fund arising in that way; that they had no right by the terms of the mortgage to assent to or even acquiesce in such diversion; but we must bear in mind the circumstances under which this took place, and consider whether the security of the complainant has been seriously impaired. It is reasonably certain that his security is more valuable in consequence of this funding arrangement, and the use of the funds acquiesced in by the trustees, and which resulted in the completion of the road. Who shall be entitled to priority out of any proceeds arising from the operation of the road, or from the sale of the property, if it shall be sold under a decree of the court, may be a question that will arise hereafter. There is but one other fact stated in the bill which can be regarded as very material. That is, what is said as to the condition, or position of the trustees in relation to the bonds. There is an allegation that one of the trustees is a stockholder in the company, and owner of a large number of bonds, and that the real controversy in the case is be-

tween the conflicting claims of the various bondholders. If we concede the authority of the case cited and relied on by the plaintiffs' counsel,—Alexander v. Iowa Cent. R. R. [Case No. 166],—that one bondholder has a right to have a mortgage foreclosed on a railroad where there has been default in the payment of interest, and where the mortgage itself provides that the trustees can proceed to foreclose, or to take other legal steps, only upon the contingency that a certain number of bondholders should ask for their action, the question is, whether this can be done in such a case as this. It is claimed it cannot be done unless the bondholders should ask the trustees to make the foreclosure, or to take such other steps as should be necessary in order that the bondholders should realize the amount due to them. In the Case of Alexander, the court considered the right of the trustees to foreclose, as stated in the mortgage, as cumulative merely, and that the bondholder was not deprived of his right, on that account, to bring a foreclosure suit. But the mortgage in that case, as in this, provided that the principal should become due only on a certain contingency, and in that case, as in this, the principal was not due at the time the bill for foreclosure was filed. In that case the mortgage provided that the principal should become due upon default in the payment of interest, whenever a majority of the bondholders should exercise the option which the mortgage gave them. In this it is given only to the trustees, so it is not competent for any one of the bondholders to declare that in consequence of a default in the payment of interest the whole is due. In this case, unlike that, no demand has been made on the trustees to foreclose this mortgage by any bondholder. There has been no demand for the sale of the property in consequence of the default in the payment of interest, under the terms of the mortgage. So that the question in this case is whether, because there has been a diversion, in the manner stated, of a portion of the funds belonging to the company from their proper direction as prescribed in the mortgage, one of the bondholders can come into a court of equity and ask for a foreclosure without a demand made on the trustees in any form. We have very great doubts whether that can be done. It is not within the case of Alexander v. Iowa Cent. R. R. [supra]; but under the circumstances in this case, and the allegations made in the bill, we think the plaintiff has a right to come into court and ask to be made a party for the protection of his interest to the litigation which is already pending in this court.

There is an allegation contained in the bill to which, perhaps, we ought to refer, as some reliance has been placed on it. It is, that because of the failure of some of the bondholders to enter into the funding arrangement, the railroad company induced the trustees, under the mortgage to file the original bill on the 31st of December, 1875, in this court, with the object of directing the suit commenced by themselves, in such a way that it could not be pressed to a decree, thereby protecting the stockholders of the railroad company and the Colby Construction Company. The instruction which was given to the trustees by certain bondholders to commence the proceedings already mentioned was as stated therein, "upon a stipulation that the same shall not be prosecuted to final judgment or decree except under the direction of a majority of said bondholders by requisition in writing as provided in said mortgage, and in no event, to the harm of said company, or to a judicial sale of the mortgaged premises at an earlier day than the provisions of the mortgage would enable it to be done in and by proceedings instituted adversely to, and without the consent of, said company." Admitting the full force of this allegation, there is nothing contained in it to affect prejudicially the rights of this plaintiff, or of the holders of bonds in the same circumstances as himself. There is no distinct and explicit allegation which the defendants can traverse. It is not stated how the company induced the trustees to institute the proceedings, neither is it said that there was any agreement made upon the subject. The whole allegation lacks precision and distinctness. There is no fraud or collusion so clearly stated as to require a traverse from the defendants.

In view of all these various considerations, and of the doubt whether an original bill of this kind can, in this case, be maintained, we feel inclined to hold that the complainant ought not to proceed with the bill as an independent measure, but that he shall come into the suit already pending in this court and ask to be admitted, for the protection of any equities which may exist in his favor. We have no doubt that this railroad property must be sooner or later sold in order to meet, as far as it can do so, the claims that are against it. We can see no particular benefit to be derived in any way by postponing the sale. We understand, although the bill states the railroad company has possession of the property, and not the Phillips & Colby Construction Co., about which a good deal is said in the pleadings, and in relation to whose rights there is no controversy here, it is conceded the trustees are now in possession, so that the object which they sought in their original and supplemental bills, has been accomplished. If the plaintiff should come in as a party to the original suit, it may be that he would have the right to ask the court to direct the trustees to amend their bill so that there may be a sale of the property, but in becoming a party to the original litigation, we think that the plaintiff should eliminate.

from his petition all except what has been now stated to constitute the material allegations. When this is done, it will be for the court to consider what his equities are, and how far those equities have been prejudiced or impaired, if at all, by any wrongful act of the trustees.

We have given generally our views upon the case as stated in the bill, and in the exhibits annexed thereto. We think it unnecessary to refer to the various exceptions in detail which have been taken to the bill, and are referred to in the report of the master, to which exceptions have been made.

[NOTE. The plaintiff subsequently filed an amended bill, to which the defendant company demurred, and the defendant trustees filed a bill setting up the pendency of their own suit, and denying all the frauds which were alleged in the bill. The case then came on to be heard upon the demurrer and plea. 1 Fed. 555.]